# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**EDWARD LUCERO,**

      **Plaintiff,**

**vs.**                                  **No.  02cv0597 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Lucero's) Motion to Reverse And Remand For Reinstatement Of Benefits, Or In The Alternative, For A Rehearing, **[Doc. No. 16]**, filed December 15, 2003, and fully briefed on June 9, 2004.  The Commissioner of Social Security issued a final decision finding Lucero had experienced medical improvement related to the ability to perform work, affirming the prior determination that Lucero was no longer disabled effective January 1, 1997, and affirming the prior determination that Lucero's disability insurance benefits be terminated effective March 1, 1997.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse and remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

Lucero, now fifty-one years old (D.O.B. 01/01/1953), filed his application for disability insurance benefits on January 25, 1989, alleging disability since July15, 1991, due to degenerative disc disease and a herniated nucleus pulposus.  On December 22, 1989, the Administrative Law

Judge (ALJ) awarded Lucero disability insurance benefits from February 8, 1988 through March 1, 1997.  In January 1997, the agency initiated a continuing disability review, concluding that Lucero's health had improved and he could return to work.[1]   On January 30, 1997, the agency notified Lucero that his benefits were being terminated.  Tr. 27.  On April 1, 1997, Plaintiff's Request for Reconsideration was denied.  Thereafter, Plaintiff filed a Request for Hearing by an ALJ.

On August 22, 1997, the ALJ held a hearing.  On September 22, 1997, the ALJ issued his decision, finding Lucero had undergone medical improvement and regained the ability to perform at least a full range of sedentary activities not requiring the use of a strong back.  Therefore, at step five of the sequential evaluation process, the ALJ found Lucero was not disabled.  Lucero filed a Request for Review of the ALJ's decision.  On January 4, 2000, the Appeals Council denied Lucero's request for review.  On February 11, 2000, Lucero sought judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

On December 8, 2000, the magistrate judge filed his Proposed Findings and Recommended Disposition, recommending that Lucero's Motion to Reverse and Remand for a Rehearing be granted.  On January 12, 2001, the district court adopted the magistrate judge's Proposed Findings and Recommended Disposition.  On November 14, 2001, the ALJ held another hearing and heard testimony from a vocational expert.  On April 10, 2002, the ALJ entered an unfavorable decision.  Lucero did not file an appeal with the Appeals Council.  Hence,

---

[1] After a claimant has been awarded disability benefits, the Commissioner is required to review the case periodically to determine whether there has been any medical improvement in the claimant's condition and whether that improvement affects the claimant's ability to work.  20 C.F.R. § 404.1594(a).

the decision of the ALJ became the final decision of the Commissioner for judicial review

purposes.  Lucero seeks judicial review of the Commissioner's final decision pursuant to 42

U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from

the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington*

*v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

An eight-part sequential evaluation process is used in termination reviews.  See 20 C.F.R. § 404.1594(f)(1) through (8).  This evaluation includes the following:

1.  Is beneficiary performing any work constituting substantial gainful activity?

2.  Does current impairment meet or equal listed impairment?

3.  Has there been medical improvement? [2]

4.  If so, is it related to the claimant's ability to do work, i.e., has there been an increase in the residual functional capacity (RFC) based on the impairment(s) present at the time of the most recent favorable medical determination?

5.  If there has been no medical improvement, or if such improvement is not related to claimant's ability to work, do any of the exceptions to medical improvement apply?  (see 20 C.F.R. 404.1594(d)-(e) for list of exceptions.)

6.  If the medical improvement is related to ability to do work, or if one of the exceptions found in 404.1594(d) apply, then are all the current impairments in combination severe?

7.  Considering all current impairments, does beneficiary have sufficient RFC to do past relevant work?

8.  In addition, considering age, education, and other past work experience, does beneficiary have sufficient RFC to perform other work?

---

[2] Medical improvement under the regulations is defined as:
Any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled.  A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).  20 C.F.R. § 404.1594(b)(1).

20 C.F.R. § 404.1594(f)(1) through (8).  The Commissioner bears the burden of showing medical improvement by establishing the claimant's medical condition has improved, the improvement is related to the claimant's ability to work, and the claimant is currently able to engage in substantial gainful activity.  *Glenn v. Shalala*, 21 F.3d 983, 987 (10th Cir. 1994).  In deciding whether to terminate benefits, a claimant's impairments are considered together.  *See* 20 C.F.R. § 404.1594(d).

Lucero was originally found to have a severe impairment of his back due to "degenerative disc disease and herniated nucleus pulposis with resultant severe, chronic low back pain and lower extremity radiculopathy."  Tr. 343.  On April 10, 2002, the ALJ reviewed the medical evidence and concluded the evidence demonstrated Lucero's back condition had significantly improved.  Tr. 124-125.  The ALJ further found Lucero's medical improvement was related to the ability to do work.  Tr. 125.  The ALJ then assessed Lucero's current residual functional capacity (RFC) and determined Lucero could perform "a limited range of light work."  *Id.*  Relying on testimony from a vocational expert, the ALJ also found Lucero could perform other work existing in significant numbers in the national economy.  Tr. 132.

In support of his motion to reverse and remand for a rehearing, Lucero advances the following arguments: (1) the ALJ's finding that his condition has improved is contrary to the evidence and the law; (2) the ALJ's finding that he can perform light work is not supported by substantial evidence; (3) the ALJ's finding that his mental impairment is not severe is not supported by substantial evidence and is contrary to law; and (4) the ALJ finding that his complaints of pain are not credible is not supported by substantial evidence and is contrary to law.

**A.  Medical Improvement Finding**

5

Lucero contends the ALJ erred in finding his condition had improved.  In his decision, the ALJ found that Lucero had experienced medical improvement and cited to the evidence to support his finding.  The ALJ found:

> I must next consider whether the claimant has undergone medical improvement.  Pursuant to 20 CFR 404.1594, "medical improvement" is defined as any decrease in the medical severity of the impairments present at the time of the most recent favorable medical decision, hereinafter referred to as the "comparison point decision," finding the claimant disabled. Whether medical improvement has occurred is determined by a comparison of the prior and current medical evidence, which must show that there have been changes (i.e. improvement) in symptoms, signs, or laboratory findings associated with those impairments.
>
> The claimant was found disabled in a decision by the Administrative Law Judge dated December 22, 1989.  This decision found that the claimant was disabled beginning February 9, 1988 within the framework of the Medical-Vocational Guidelines based on a residual functional capacity for less than a full range of sedentary work (Exhibit 20).  Since there have been no subsequent favorable decisions in this case, I find the December 22, 1989 Administrative Law Judge decision is the comparison point decision in this case.
>
> At the time of the comparison point decision, the claimant reported that his pain became unbearable if he sat for more than 30 minutes.  He received only minimal relief from his pain medications.  He had decreased reflexes at the right ankle and absent left ankle reflexes. Straight leg raising caused back pain.  There was also evidence of L5 radiculopathy (Exhibit 20, p.3).
>
> In contrast, as of the time of the November 26, 1996 consultative examination report by Dr. Gwen Y. Sun, the claimant exhibited no evidence of muscle spasms.  He had patellar deep tendon reflexes of 2+ bilaterally.  His straight leg raising test was essentially negative, except on the right leg at 90 degrees.  He was able to walk on his heels and toes and squat without much difficulty.  Achilles' reflexes were 1+ and bilaterally symmetrical.  The neurological examination including sensory and motor was within normal limits.  Dr. Sun concluded that the claimant's back condition was subclinical (Exhibit 16).
>
> As of September 26, 1996, the claimant has normal gait.  There was no muscle spasm in his lumbar region.  Lateral flexion of his lumbar spine was intact with only mild limitations in extension and forward flexion.  Straight leg raising was negative (Exhibit B-2F, p.7). Similarly, on May 5, 1997, the claimant had a normal gait.  There was no muscle spasm and lateral flexion of the lumbar spine was intact.  Extension was only mildly limited, as was forward flexion.  Seated straight leg raising and simulation rotation were negative (Exhibit B-2F, p.6).
>
> In contrast to his minimal response to pain medications at the time of the comparison point decision, the claimant has responded well to Darvocet and epidural blocks around the time of cessation (Exhibit 2-F).

Therefore, the claimant has undergone medical improvement since the time of the comparison point decision.

Tr. 124-125.  A review of Lucero's medical records supports the ALJ's finding that he had undergone medical improvement.

### Summary of Medical Records

On **May 12, 1988**, Dr. Barry M. Diskant, a specialist with Albuquerque Industrial Medicine Specialists, evaluated Lucero.  Tr. 409-411.  Dr. Diskant noted Lucero had a history of an injury to his back on or around February 8, 1988.  Lucero informed Dr. Diskant that he had received treatment consisting of chiropractic adjustment, heat therapy, electrical stimulation and "activator" machine treatment.  Tr. 410.  Lucero reported "**having virtually no back pain now**." *Id.*

Dr. Diskant performed a "detailed, comprehensive examination of the spine."  *Id.* Dr.Diskant noted:

> He had full voluntary range of motion of the cervical, dorsal and lumbar spine in flexion, extension, rotation and lateral bending.  Specifically, lumbar flexion was to 90 degrees, extension -35 degrees, rotation 45 degrees bilaterally, lateral bending 40 degrees bilaterally. His gait was normal. He was able to walk on his heels and toes and to squat without the slightest bit of difficulty.  He was able to hop on the right and left foot individually without increased pain.  He got on and off the examining table without the slightest difficulty.  He had no tenderness on palpation of the midline bony spinous processes in the cervical, dorsal, and lumbar spine.  He had no tenderness over the SI joints, iliac crest or sciatic notches. Neurologic examination was conducted.  Deep tendon reflexes were 2+ and equal at the knees, 1+ and equal at the ankles.  Motor examination showed full muscle strength in both lower extremities without atrophy or asymmetry.  There was no weakness.  Pin prick sensation and light touch sensation were within normal limits in both legs.  Straight leg raising was negative to 90 degrees bilaterally.  There was no back list (?).  There was no abnormal kyphoscoliosis of the spine.  There was no pelvic obliquity.  There was no antalgia.
>
> X-rays of the lumbar spine were taken at the office of Dr. Munzer on 2/15/88 and were reviewed by me.  The films are entirely within normal limits.  AP and lateral views of the lumbar spine show no abnormality whatsoever.  The intervertebral disk spaces are well preserved.

Tr. 410.  Dr. Diskant diagnosed Lucero with low back sprain, resolved.  Dr. Diskant noted

Lucero was "fearful about returning to his prior heavy work" and opined there was no physical

basis for his concern since there was a normal spine examination and normal x-rays.  Dr. Diskant

recommended a "work hardening program" to build up Lucero's confidence regarding his

physical capabilities and to strengthen his back.  Dr. Diskant referred Lucero to Life Trends

Fitness & Rehabilitation Institute and opined his prognosis for complete recovery was excellent.

Tr. 411.

On **May 31, 1988**, Lucero returned to see Dr. Diskant.  Tr. 408.  Lucero was

"enthusiastic about the Work Hardening Program."  *Id.*  Lucero reported he was gaining self-

confidence, mobility, and knowledge of safe lifting techniques.  On examination, Lucero had full

range of motion of the lumbar spine.  Dr. Diskant opined Lucero was doing well and directed him

to return in two weeks for a follow-up.

On **June 14, 1988**, Lucero returned for his follow-up.  Tr. 407.  Lucero reported he was

gaining strength and flexibility through the program and had **no significant back pain**.  Dr.

Diskant noted, "He feels optimistic about the program and what it is doing for him."  *Id.*  On

examination, Lucero had full range of motion of the lumbar spine in flexion, extension, rotation

and lateral bending.  Dr. Diskant directed Lucero to return in two weeks.  Dr. Diskant noted Dr.

Donna Deming would recheck Lucero in his absence.

On **July 21, 1988**, the progress notes indicate "patient returned and is still having quite a

bit of back pain."  Tr. 406.  It is not clear if Dr. Deming evaluated Lucero at this visit.

Nonetheless, contrary to the previous progress notes, Lucero reported "no improvement thus far"

on the Work Hardening Program.  The physician ordered a "three level lumbar CT scan to rule

out the possibility of a herniated disc." *Id.* The physician prescribed Rufen 800 mg three times a day with meals.

On **July 28, 1988**, the CT scan revealed the following:

1.  Moderate L5-S1 left lateral disc bulge compromising inferior half of the right nerve root canal. Whether right L5 nerve root is impinged cannot be ascertained based on this study.
2.  Mild L4-5 central disc bulge with minimal thecal sac compression.

Tr. 405.

On **August 1, 1988**, Dr. Diskant reviewed the CT scan and discontined the Work Hardening Program and switched him to a program of pelvic traction "to help reduce some of the bulging which [was] present and to reduce nerve root pressure and pain." Tr. 404. Lucero was up to lifting 36 pounds at that time. Dr. Diskant prescribed a TENS unit, continued the pool therapy program and continued the Ibuprofen 800 mg. Dr. Diskant opined Lucero remained unable to return to his heavy occupation and his prognosis to return to such work remained guarded. Dr. Diskant directed Lucero to return in three weeks.

On **August 22, 1988**, Lucero returned to see Dr. Diskant. Tr. 403. Lucero reported his pain was five on a scale of zero to ten. Dr. Diskant noted a progress note from Life Trends indicating Lucero's lower extremity pain had been virtually eliminated with the pelvic traction. Lucero also reported the TENS unit had "helped quite a bit." *Id.* Dr. Diskant noted Lucero's leg pain was gone but his back pain persisted. The physical examination revealed a full range of motion of the lumbar spine. Dr. Diskant continued Lucero's Rufen 800 mg and directed him to continue his comprehensive back rehabilitation and traction but reduce the frequency of treatment from daily to three days a week. Dr. Diskant directed Lucero to return in three weeks.

On **September 15, 1988**, Lucero returned for his follow-up visit with Dr. Diskant.  Tr. 402.  Lucero reported he was continuing to improve his strength and endurance at Life Trends and felt the program was beneficial.  Lucero also reported the TENS unit helped quite a bit. Lucero complained the Rufen was upsetting his stomach.  Dr. Diskant prescribed Pepcid and noted Lucero should not receive any other anti-inflammatory medicine because of his reaction to Rufen.  Dr. Diskant also opined Lucero would not be able to return to his occupation as a hod carrier and recommended vocational retraining.  Dr. Diskant prescribed Amitriptyline 25 mg at bedtime for sleep and Extra Strength Tylenol.  Dr. Diskant directed Lucero to return in three weeks.

On **September 29, 1988**, Lucero returned for his follow-up visit with Dr. Diskant.  Tr. 400.  Lucero complained of back pain.  Lucero reported the comprehensive rehabilitation program had improved his strength and flexibility but had not diminished his pain.  Lucero reported the TENS unit helped quite a bit but the Tylenol did not.  Dr. Diskant prescribed Talacen, a narcotic analgesic.  Dr. Diskant opined Lucero would not be able to return to his former job as a hod carrier and felt further testing and consultation were indicated.  Dr. Diskant referred Lucero to Dr. Mark Berger for an EMG/nerve conduction study of the lower back and lower extremities.  Dr. Diskant also referred Lucero to Dr. Timothy Watson, an orthopedic specialist in the area of spinal problems.  Dr. Diskant directed Lucero to return in one month.

On **October 5, 1988**, Dr. Mark Berger performed a neurological evaluation.  Tr. 414-415. The neurological evaluation revealed "2+ reflexes throughout except for an absent left ankle jerk with plantar flexion bilaterally."  Tr. 414.  The sensory examination was intact.  Dr. Berger's impression was that Lucero's symptoms were compatible with lumbar radiculopathies, with the

absent ankle jerk on the left suggesting the major involvement was the left S1 nerve root.  Tr. 415.  Dr. Berger opined Lucero had a " bilateral lumbar radiculopathies secondary to the disc displacement at the L5, S1 level."  Tr. 413.  Dr. Berger noted "From the examination and electrical studies it is primarily compressing the left S1 nerve root.  I could find no other abnormalities."  *Id.*  Dr. Berger suggested surgery and opined no further neurological diagnostic studies were necessary.

On **October 17, 1988**, Dr. Timothy Watson evaluated Lucero.  Tr. 417-420.  The physical examination revealed +2 reflexes except for an absent left ankle reflex.  The sensory examination was normal.  Dr. Watson diagnosed Lucero with degenerative disc disease with probable left sided disc herniation and L-5 motor radiculopathy as evidenced by lack of ankle jerk.  Tr. 419.  Dr. Watson recommended (1) continued back exercise program and anti-inflammatory agents such as extra-strength Tylenol, LS corset and time "with the idea of vocational retraining; or (2) surgical approach, "and again still with vocational retraining."  Tr. 420.  Dr. Watson gave Lucero a corset and told him to return on an as-needed basis.

On **November 3, 1988,** Lucero returned for his follow-up visit with Dr. Diskant.  Tr. 399.  Lucero informed Dr. Diskant he was not interested in having surgery.  Dr. Diskant continued the back therapy and directed him to return in one month.  Dr. Diskant noted that if Lucero's condition had not improved by mid-January, Lucero should seriously consider surgical intervention.

On **November 21, 1988**, Dr. Diskant noted a telephone conversation he had with Gary Salazar, the physical therapist with Life Trends in charge of Lucero's rehabilitation.  Tr. 398.  Mr. Salazar reported Lucero had been coming late and leaving early from the program and had not

been participating in all aspects of the program.  Contrary to Mr.Salazar's report, Lucero had

been reporting that he had been participating in all aspects of the program.  Dr. Diskant directed

Mr. Salazar to document his observations in writing.  Dr. Diskant also authorized a functional

capacity evaluation by Mary Lou Langford.

On **December 8, 1988**, Lucero returned to see Dr. Diskant.  Tr. 397.  Lucero reported he

was still having quite a bit of pain.  Dr. Diskant noted he had received a call from Life Trends

reporting Lucero had not been less cooperative than he was before.  Lucero complained that some

of the exercises increased his pain, so he did not want to do them.  Dr. Diskant continued the

comprehensive back program and recommended he return to see Dr. Watson if he did not

improve in another month.  Dr. Lucero prescribed Talwin NX because the Talacen was no longer

working.

On **January 19, 1989**, Lucero returned to see Dr. Diskant.  Tr. 395.  Lucero complained

of back and leg pain.  Dr. Diskant referred him to Dr. Watson.  Dr. Diskant noted Dr. Berger also

had suggested surgery.  Dr. Diskant refilled the Talwin and directed Lucero to return in one

month.

On **February 2, 1989**, Lucero returned to see Dr. Diskant.  Tr. 416.  Lucero complained

of persistent back pain and occasional pain going into both legs to the level of the knee.  Dr.

Diskant diagnosed Lucero with degenerative disc disease L-5, S1 with probable left sided disc

herniation and motor radiculopathy as evidenced by lack of ankle jerk.  Dr. Diskant recommended

surgery but assured Lucero it was his decision to make.

On **February 16, 1989**, Lucero returned to see Dr. Diskant.  Tr. 394.  Lucero had seen

Dr. Watson who had recommended surgery.  Lucero reported he had increased his level of

activity but this had increased the pain.  Dr. Diskant opined Lucero was at maximum medical improvement.  Dr. Diskant refilled the Talwin and Colace for constipation.

On **March 14, 1989**, Lucero returned to see Dr. Diskant.  Tr. 393.  Dr. Diskant noted Lucero's rectal bleeding had stopped with the Colace (stool softener).  Lucero continued to participate in the comprehensive back rehabilitation program and was now working on the Cybex machine.  Lucero was not interested in surgery.  Dr. Diskant opined Lucero had reached maximum medical improvement and referred him for a "full functional capacity assessment to be accompanied by a Cybex back evaluation."  *Id.*  Dr. Diskant refilled Lucero's medications and directed him to return in one month to discuss the functional capacity assessment.

On **April 17, 1989**, Lucero returned for his follow-up visit with Dr. Diskant.  Tr. 392. Lucero reported he had undergone the Cybex evaluation and the functional capacity assessment. However, Dr. Diskant did not have the results.  Lucero also reported his pain had increased since he stopped going to Life Trends.  He told Dr. Diskant he would like to continue working out at Life Trends.  Dr. Diskant gave him a six-month medical fitness membership at Life Trends, so he could continue to work out without participating in the formal comprehensive back program.  Dr. Diskant refilled the Talwin and Colace and directed him to return in one month.

On **May 15, 1989**, Lucero returned to see Dr. Diskant.  Tr. 391.  Dr. Diskant had received the results of the Cybex back evaluation.  Dr. Diskant opined Lucero had reached maximum medical improvement and could work at jobs in which "he lifts up to 50 pounds, carries up to 40 pounds, pushes 50 pounds, and pulls 63 pounds."  *Id.*  Dr. Diskant found Lucero had a 10% permanent partial impairment of the body as a whole based on the AMA Guide.  Dr. Diskant

13

refilled the Talwin, directed Lucero to contact him for medication refills, and return in about six months.

On **September 6, 1989**, Nancy McCurdy, Lucero's rehabilitation consultant, referred him to Dr. William Wellborn. Tr. 431-434. Lucero complained of low back pain with radiation into both lower extremities especially on the right. Tr. 431. Lucero reported his pain was occasionally on the posterior aspect of his thigh and at times involved the anterior aspects of his thighs. Lucero also reported that, although he had a TENS unit and it helped his back pain, he did not use it. Tr. 432. Lucero stated forward bending and twisting of his back increased the pain. Lucero was taking Talwin two per day. The physical examination revealed the following:

> BACK:  Thoraculumbar ROM is as follows: Extension is 30 degrees, flexion is 90 degrees, lateral flexion bilaterally is greater than 30 degrees, rotation is 20 degrees in each direction. The patient was tender in the left buttock as well as the lumbosacral junction paraspinals and in the posterior superior iliac spine area. There is flattening of the lumbar lordosis.
>
> NEUROLOGIC:  The patient could heel and toe walk adequately and does not show any weakness of the lower extremities. The calves were measured bilaterally 5 inches distal to the patella and were 15 ½ inches in circumference bilaterally.
>
> REFLEXES:   Intact at the knees and right ankle. However, the left ankle jerk was unobtainable. Pin prick examination demonstrate a slightly decreased pin prick appreciation on the dorsum of the left foot. The patient could heel and toe walk adequately as well as arise from a squat. There was no weakness noted in the lower extremities. Straight leg raising caused low back pain only with elevation of the right lower extremity to approximately 50 degrees. Seated straight leg raising did not appear to cause pain. The patient was cooperative throughout the examination and showed no symptoms magnification.

Tr. 433. Dr. Wellborn opined Lucero "may benefit from a surgical procedure." *Id.* Dr. Wellborn ordered an MRI of the lumbar spine. Depending on the results, Dr. Wellborn felt epidural steroid treatment would benefit Lucero. Dr. Wellborn also noted the TENS unit relieved Lucero's pain and recommended Lucero learn how to use it properly and go off the narcotic medications.

Finally, Dr. Wellborn recommended a work hardening program in case Lucero needed vocational training.

On **September 12, 1989**, Dr. Wellborn noted he had spoken to Nancy McCurdy regarding Lucero.  Tr. 430.  Dr. Wellborn felt Lucero would benefit from a psychological evaluation in order to help him deal with his fear of surgery.

On **October 12, 1989**, Lucero returned to see Dr. Wellborn.  Tr. 429.  Lucero reported the back pain was the same.  The MRI results indicated: "[T]here is degeneration of disks L4, L5, and degeneration and dehydration of L5, S1.  There is posterior disk protrusion of L5, S1 to the right with minimal encroachment upon the intervertebral foramina at that level." *Id.*  The examination showed no weakness of the lower extremities, pin prick was intact, reflexes were intact at the knees, decreased at the right ankle and absent in the left ankle, and straight leg raising caused back pain.  Dr. Wellborn recommended a surgical evaluation.

On **November 14, 1989**, Lucero returned to see Dr. Wellborn.  Tr. 428.  Although Lucero continued to have back pain, he reported he had cut down his use of Talwin.  Dr. Wellborn noted Lucero appeared to be in discomfort as he got up and down from a seated position.  Extension caused pain but forward flexion did not.  Dr. Wellborn prescribed Clonidine 0.1 mg for his elevated blood pressure and Darvocet N 100 for the pain.  Dr. Wellborn was still considering epidural steroid injections.

On **December 8, 1994**, Lucero returned to see Dr. Wellborn.  Tr. 83.  **Lucero had not seen Dr. Wellborn for about a year**.  Lucero reported that he had seen Dr. Twiesta for his hemorrhoids and had required a hemorroidectomy.  Dr. Wellborn noted the physical examination was unchanged from his last visit, which was "about one year ago." *Id.*  Lucero also reported

taking Darvocet "about two per day at most" and occasionally taking Skelaxin.  Dr. Wellborn

noted Lucero did not take Clonidine anymore.  Lucero's blood pressure was normal on that day.

Dr. Wellborn directed Lucero to return in six months.

On **September 26, 1996**, Dr. Wellborn evaluated Lucero.  Tr. 81. Dr. Wellborn set up

this evaluation because he had "been refilling [Lucero's] medications for several years," but had

not "seen him for some time."  *Id.*  In fact, **Dr. Wellborn had not seen Lucero since December**

**of 1994**.  Dr. Wellborn performed a physical examination and found:

> **Examination**
> On examination, Edward appears to be in no acute distress.  His **gait is normal**.  There was
> **no muscle spasm in his lumbar region**.  **Lateral flexion of his lumbar spine is intact** with
> **some mild limitations of extension and mild limitation of forward flexion**.  **Straight leg**
> **was negative**.  His blood pressure was 135/100.  I told him that was somewhat elevated and
> he should have this monitored by a primary physician as I am caring only for his work related
> injury.

Tr. 81.  Dr. Wellborn assessed Lucero as having "chronic low back pain," and directed him to

return in six months.

On **November 26, 1996**, Dr. Gwen Y. Sun, an agency consultant, evaluated Lucero.  Tr.

85-91.  Lucero reported he continued to have medical coverage through Workers' Compensation

but had not seen a medical physician regarding his back.  Dr. Sun performed a physical

examination and noted:

> PHYSICAL EXAMINATION:  His height is 70".  Weight is 188 pounds.
> Vital signs reveal a blood pressure of 114/82.  Pulse is 72 beats.
> Vision uncorrected in the right eye and the left eye is 20/30.  General examination:  The
> general exam reveals an alert and oriented x3 white male, who walks with a somewhat
> **exaggerated and antalgic gait**.  He is alert and oriented x3.
>
> His mental status appears to be stable.  He appears to be of average or above [average]
> intelligence.  He follows the QA session without any difficulties. He denies having a past
> history or current problem of depression or suicidal ideation.

16

> HEENT exam is within normal limits.  His cardiovascular exam is insignificant.  Pulmonary exam is clear to auscultation in all quadrants.  Abdomen exam is benign and nontender.  The **musculoskeletal exam of his low back is negative for any spasm palpable over his paraspinous muscles and axial loading is not particularly tender**.  He has a patellar DTR (deep tendon reflexes) of 2+ bilaterally and symmetrical with enhancement.  His **straight leg raise is essentially negative**, except on the right leg at 90 degrees, and is slightly tender on the right side.  The **patient is able to walk on the heels and toes and squat without much difficulty**.  The Achilles' reflexes are 1+ and bilaterally symmetrical.  He has a downgoing big toe.  **Neuro exam, including sensory, motor and cerebellar and cranial nerves III to XII, is within normal limits**.

Tr. 86.  Dr. Sun diagnosed Lucero with Status post herniated disc at L5-S1.  *Id.*  Dr. Sun's

prognosis was as follows:

> PROGNOSIS:  This particular **claimant's back condition** was certainly one that had some long-term rehabilitation; however, it **is not one that provides a lifetime disability, and especially in this case, he did not have surgery, and therefore does not have a surgically unstable back**.  He has reportedly a herniated disc at the level of L5-S1 that the patient suggests has been suggested for surgery, but not mandatory.  We feel that this particular case, the average statistic is that they do have some long-term disability that is about a year or two, but certainly no more than that.  **At this point, we feel that this patient's back condition is subclinical**.  We feel, at this point, he **may have some limitations to the most vigorous and laborious jobs**.  Aside from that, **he should be able to do a lot of the employment jobs out there that do not require the most laborious work that require him to have a strong back**.  Certainly, we feel that **he should have the ability to do a lot of different types of employment**.

Tr. 86-87.  Dr. Sun completed a Medical Source Statement Of Ability To Do Work-Related

Activities.  Tr. 88-89.  Dr. Sun opined Lucero could lift 45 pounds occasionally and 20 pounds

frequently.  Dr. Sun opined Lucero's impairment <u>did not affect</u> his ability to (1) stand or walk; (2)

sit; (3) reach; (4) feel; (5) speak; (6) handle; (7) hear; or (8) travel.  Tr. 89.

Dr. Sun also completed a Range of Motion Form.  Tr. 90-91.  Dr. Sun noted an essential

normal range of motion examination with only a <u>slight</u> limitation in lumbar region flexion and

extension.  Tr. 91.  Dr. Sun also noted Lucero could squat, walk on his toes, and walk on his

heels.  *Id.*

On **November 26, 1996**, Dr. Gwen Sun ordered a x-rays of the lumbar spine.  Tr. 84.
The x-rays showed, "Five normal weight bearing lumbar vertebrae with preserved intervertebral
disc space throughout the lumbar spine.  Minimal degenerative disc anteriorly.  Positive for grade
I (mild) Sondylolisthesis with bilateral Spondylolysis at the L5 level.  L5-S1 disc space is
preserved."  *Id.*

On **February 11, 1997**, Dr. Wellborn submitted a "To Whom It May Concern" letter.  Tr.
100.  The letter stated: "I have been treating Mr. Lucero for several years now for chronic back
pain.  He is **disabled from his previous position as a hod carrier**.  Please feel free to contact
me should you have any questions."  *Id.*

On **February 13, 1997**, Dr. Valerie Dillon completed an "Advisory RFC."  Tr. 92-99.
After reviewing the medial record, Dr. Dillon opined **Lucero retained the RFC to perform
medium level work**.  Tr. 93.  Dr. Dillon cited to the record to support her opinion.

On **August 14, 1997**, Lucero submitted a statement from a John Guttman, M.D., a
physician at Lovelace Health Systems.  Tr. 101.  Dr. Guttman wrote the results of an x-ray of the
c-spine performed "within the past month" on a Lovelace form.  The results indicated a "**slight
amount of narrowing** C6-7 disc space probably from a worn out disc."  *Id.*

On **May 5, 1997**, Lucero returned for his follow-up visit with Dr. Wellborn.  Tr. 266.
Lucero reported he was trying to get Social Security.  Dr. Wellborn performed a physical
examination and noted, "[A]ppears to be in no acute distress.  **His gait is normal.  There were
no muscle spasms in his lumbar region.  Lateral flexion of his lumbar spine is intact.
Extension is mildly limited, as was forward flexion.  Seated straight leg raising was**

**negative**.  **Simulated rotation was negative**." *Id.*  Dr. Wellborn directed Lucero to continue

taking the Skelaxin and Darvocet and return for a follow-up in four to six months.

On **September 24, 1997**, Dr. Guttman ordered a Lumbar Spine MRI.  Tr. 105.  The

results of the MRI are as follows:

> IMPRESSION: 1.  There is a right lateral disc protrusion at L5-S1 that extends into the neural foramen and which **may be impinging** upon the right L5 nerve root as it lies in the foramen.
>
> 2.  There is a far right lateral broad-based disc protrusion at the L4-5, which **is not impinging upon the already exited right L4 nerve root**. There is **some minimal** effacement of the right anterolateral thecal sac However,
>
> 3.  **No other significant evidence of HNP**
>
> 4.  **No significant central stenosis**.
>
> 5.  There is **some mild** right foraminal stenosis at L5-S1.

Tr. 105-107.

On **January 19, 1999**, Lucero returned to see Dr. Wellborn.  Tr. 265.  Lucero reported

the Darvocet was helpful.  Tr. 265. Dr. Wellborn noted he **had last seen Lucero in November of**

**1997**, and had had "no intervening medical problems." *Id.*  Lucero reported taking medication for

his high blood pressure but was unsure as to what he was taking.  Lucero also reported he had <u>no</u>

<u>problems with this stomach</u>.  Dr. Wellborn performed a physical examination and noted a **normal**

**gait**, "**nearly intact**" lateral flexion, **mildly to moderately limited extension**, and **moderately**

**limited forward flexion**.  *Id.*  Dr. Wellborn also noted Lucero had "**full strength in both lower**

**extremities" and "seated and supine straight leg raising was negative**." *Id.*  Dr. Wellborn

diagnosed Lucero with chronic back pain.  Dr. Wellborn discontinued the Skelaxin and prescribed

a trial of Ultram (for pain relief).  Dr. Wellborn directed Lucero to **return in six months.**

On **January 12, 2000**, Tahir Qaseem, M.D., a gastroenterologist at University Hospital, diagnosed Lucero with **gastroesophageal reflux disease**. Tr. 289-290. Dr. Qaseem noted Lucero's symptoms "**were well controlled on Prilosec**." Tr. 290. Dr. Stogner directed Lucero to return in twelve months.

On **January 20, 2000**, Lucero returned for a follow-up visit with Dr. Wellborn. Tr. 264. Lucero complained of radiating pain down his left leg and back but denied weakness of the left leg. Dr. Wellborn noted Lucero had complained of these symptoms in the past and had **responded well to epidural injections**. The physical examination revealed **positive straight leg raising on the left**, **full strength in both lower extremities, and reflexes 2+ at the knees, 1+ at the ankles**. Dr. Wellborn administered a lumbar epidural steroid block.

On **February 9, 2000,** Dr. Melvin Golish, a non-examining agency consultant and orthopedic surgeon, completed a Physical Residual Functional Capacity (RFC) Assessment form. Tr. 277-284. Dr. Golish reviewed the record and opined Lucero could lift 50 pounds occasionally, lift 25 pounds frequently, stand and/or walk about six hours in an 8-hour workday, sit about six hours in an 8-hour workday, and his ability to push and/or pull was unlimited. Tr. 278. Dr. Golish also opined Lucero could only occasionally stoop, but he could frequently climb, balance, crouch, and crawl. Tr. 279. Dr. Golish cited to the record to support his opinion. On April 27, 2000, Dr. M. Z. Yoder, an agency consultant, reviewed the record and concurred with Dr. Golish's RFC assessment.

On **February 15, 2000**, Lucero returned to see Dr. Wellborn. Tr. 263. Lucero reported his leg and back pain decreased with the epidural steroid block. **Lucero also complained of depression**. Lucero informed Dr. Wellborn that he had previously been on Prozac. Dr. Wellborn

noted, "**he tells me he is depressed, but is not suicidal**." *Id.* The physical examination revealed **no muscle spasm in the lumbar region and a normal gait**. Dr. Wellborn diagnosed Lucero with radicular and low back pain, chronic and **secondary depression**. Dr. Wellborn prescribed a trial of Paxil and directed Lucero to return in two weeks.

On **March 9, 2000**, Lucero returned for his follow-up visit with Dr. Wellborn. Tr. 262, 303. Lucero reported "**very little radiating leg pain**." *Id.* Lucero also reported his back still bothered him a lot and told Dr. Wellborn that he did not tolerate the Paxil and preferred Prozac. The physical examination revealed a **normal gait and a negative straight leg raising**. Dr. Wellborn prescribed Prozac and directed Lucero to return in "a few months unless the Prozac [was] ineffective." *Id.*

On **April 27, 2000**, Dr. Scott Walker, a psychiatrist and agency consultant completed a Psychiatric Review Technique (PRT) form. Tr. 268-277. **Dr. Walker opined Lucero depression was "not severe."** Tr. 268. **Dr. Walker found no functional limitations**. Tr. 275.

On **July 20, 2000,** Lucero returned for a follow-up visit with Dr. Wellborn. Tr. 288, 302. Lucero complained of having right foot pain. **Lucero reported responding well to Prozac**. Dr. Wellborn noted tenderness over the plantar fascia on the bottom of the right foot. **Straight leg raising was negative on the right as well as on the left**. Dr. Wellborn diagnosed Lucero with chronic back pain with radicular symptoms but noted his condition was stable. Dr. Wellborn also diagnosed Lucero with plantar fasciitis. Dr. Wellborn recommended heel cord stretching and shoes with good arch support. Dr. Wellborn also directed Lucero to continue the Prozac and return in four months.

On **February 6, 2001**, Lucero returned for his follow-up visit with Dr. Wellborn.  Tr.
301.  Lucero reported "things had been stable."  *Id.*  **Lucero reported he was having no
radiating leg pain, or numbness, or tingling**.  The physical examination revealed Lucero was in
no acute distress, had a **normal gait, had full strength in both lower extremities and straight
leg raising was negative**.  Notably, there were **no muscle spasms in the lumbar region**.
**Forward flexion was moderately limited in the lumbar spine**.  Dr. Wellborn directed Lucero
to continue taking his medications and return in three to four months.

On **April 4, 2001**, Lucero returned to the Gastroenterology Clinic at University Hospital.
Tr. 313.  Dr. Qaseem ordered an endoscopy to reevaluate Lucero's esophagus for Barrett's
changes. Dr. Qaseem also ordered repeat biopsies and an outpatient colonoscopy to screen for
colon cancer.

On **June 11, 2001**, Lucero had a colonoscopy performed at University Hospital.  Tr. 336.
The findings indicated normal colonic mucosa, no masses or polyps, and internal hemorrhoids.
Dr. Strickland recommended a high fiber diet.

On **June 29, 2001**, Dr. Eugene Toner, an agency consultant, evaluated Lucero.  Tr. 317-
324.  Lucero reported he did no chores and watched television and slept during the day.
According to Lucero, he could lift fifteen pounds, stand for 10 minutes, sit for 15 minutes, walk
for 15 minutes, and ride in a car for an hour.  Tr. 318.  Lucero reported he had to lie down two to
three times a day for about thirty minutes each time and could not bend down.  The orthopedic
examination revealed as follows:

> Cervical and thoracic range of motion is full.  Lumbar range of motion, forward flexion is 45
> degrees, while standing and he will sit up with his legs extended.  Lateral flexion 35 degrees
> right and left with full extension.  Straight leg-raising test is positive, it is 45 degrees, both

right and left while supine and negative while sitting. Shoulder, elbows, and wrists have full range of motion and hands have good grip pinch and oppositional strength. His hands are significantly callused, dirty, and there are abrasions on the dorsum of both hands, right greater than left. Hips will flex 60 degrees right and 45 degrees left and extend 15 degrees bilaterally; otherwise full range of motion is noted. Knees and ankles have full range of motion.

The claimant has **no evidence of any sensory loss** to light touch in the upper and lower extremities. He gives **good strength in the shoulder girdles, quadriceps, and hamstrings.** Deep tendon reflexes are 1+ and equal in the upper extremities, and trace and equal in the lower extremities. There is no evidence of any deformities and **no evidence of any atrophy of the upper or lower extremities.**

Two views of the lumbar spine are obtained. These show narrowing of both the L4-L5 and L5-S1 disc space, which is rather significant. There is also wedging of the L4 vertebra with approximately 10% height loss anteriorly. The remainder of the disc spaces appear to be well maintained. There is evidence of facet sclerosis at L5-S1 bilaterally.

Tr. 318-319. Dr. Toner noted Lucero's hands were dirty and calloused indicating he used them "in a fairly normal fashion, and "enough to indicate that he does use them for some fairly heavy activity." Tr. 319. Dr. Toner found Lucero's claim that he was very inactive not credible. Dr. Toner opined Lucero's degenerative disc disease would keep him from lifting 20 pounds on an occasional basis and keep him from walking or sitting more than six hours a day. *Id.*

Dr. Toner submitted a Medical Source Statement Of Ability To Do Work-Related Activities. Dr. Toner opined Lucero could lift twenty pounds occasionally and ten pounds frequently, could stand and/or walk up to six hours in an 8-hour workday, and could sit up to six hours in an 8-hour workday. Tr. 323-324. Dr. Toner found no limitations in Lucero's ability to speak, hear, travel, reach, or handle objects. Finally, Dr. Toner found Lucero's ability for fine manipulation with his hands and fingers was intact.

On **November 5, 2001**, Lucero returned to see Dr. Wellborn. Tr. 325. Lucero complained of severe low back pain with radiation into his buttocks and down into his left leg. He denied numbness or tingling in his legs. Dr. Wellborn noted, "He feels he is under a lot of

stress.  He lost his social security benefits in 1996 and is now trying to get them back."  *Id.*  The physical examination revealed a **normal gait, negative straight leg raising, and no muscle spasm in the lumbar region**.  Dr. Wellborn noted **forward flexion was quite limited**.  Dr. Wellborn directed Lucero to continue taking his medications and return in six months.

On **November 21, 2001**, Lucero went to University Hospital for an EGD (Esophagogastroduodenoscopy –  endoscopic examination of the lining of the esophagus, stomach and upper duodenum).  Tr. 326.  Lucero had a previous EGD performed at University Hospital on June 19, 2001.  The November 21, 2001 EGD revealed a small hiatal hernia, a normal gastroesophageal junction, a normal stomach, and a normal duodenum.  Dr. Qaseem recommended Lucero continue on his medication (Prilosec), raise the head of the bed four to six inches, and advised him not to lie down for at least three to four hours after meals.  Dr. Qaseem also recommended Lucero lose weight and gave him a list of foods to avoid.

Prior to being awarded disability benefits, Lucero filed his Request for Hearing by Administrative Law Judge.  Tr. 356.  At that time, Lucero claimed he was "under constant care since the date of  of [his] injury (2-8-88)."  *Id.*  Lucero also stated in his May 16, 1989 Reconsideration statement that he "need[ed] assistance with bathing and dressing . . . ."  Tr. 379.  Recent medical reports indicate Lucero no longer requires "constant care" or assistance with activities of daily living.  The medical records also indicate Lucero has gone for long periods of time without receiving any medical care for his back even though Workers' Compensation pays for his medical care.

Additionally, as the ALJ noted, the objective medical evidence indicates Lucero's symptoms have improved.  The ALJ cited to Lucero's recent examination with Dr. Sun which

indicated he had no evidence of muscle spasms, deep tendon reflexes were 2+ bilaterally, straight leg raising tests were essentially negative, he was able to walk on his heels and toes and squat without much difficulty, achilles' reflexes were 1+, and the neurological examination was normal. Similar findings were noted by Dr. Wellborn and Dr. Toner.  *See e.g.*, Tr. 81 (September 26, 1996 visit to Dr. Wellborn– normal gait, no muscle spasms in lumbar region, lateral flexion of lumbar spine intact, some mild limitations of extension and forward flexion, negative straight leg raising); Tr. 266 (May 5, 1997 visit to Dr. Wellborn– normal gait, no muscle spasms in lumbar region, lateral flexion of lumbar spine intact, extension and forward flexion mildly limited, seated straight leg raising negative, simulated rotation negative); Tr. 265 (January 19, 1999 visit to Dr. Wellborn–  normal gait, nearly intact lateral flexion, mildly to moderately limited extension, moderately limited forward flexion, full strength in lower extremities, seated and supine straight leg raising negative); Tr. 264 (January 20, 2000 visit to Dr. Wellborn–  full strength in lower extremities, reflexes 2+ at knees and 1+ at ankles, positive straight leg raising); Tr. 263 (February 15, 2000 visit to Dr. Wellborn– no muscle spasms in lumbar region and normal gait); Tr. 262 (March 9, 2000 visit to Dr. Wellborn– normal gait and negative straight leg raising); Tr. 288 (July 2000 visit to Dr. Wellborn– straight leg raising negative bilaterally); Tr. 301 (February 6, 2001 visit to Dr. Wellborn– normal gait, full strength in lower extremities, no muscle spasms in lumbar region, negative straight leg raising); Tr. 325 (November 5, 2001 visit to Dr. Wellborn– normal gait, negative straight leg raising, no muscle spasm in lumbar region, forward flexion quite limited).

Based on the record as a whole, the Court finds substantial evidence supports the ALJ's finding that Lucero had experienced medical improvement since the time of the comparison point

decision.  Tr. 125.  Although Lucero lists some evidence that <u>may</u> tend to support his disability

claim, the determinative conclusion is that there is also substantial evidence to support the ALJ's

finding of no disability.  *Woodward v. Shalala*, No. 94-7012, 1994 WL 408169, at **1 (10th Cir.

Aug. 4, 1994)(unpublished opinion)("While we acknowledge the presence of evidence in the

record which may tend to establish claimant's disability, the determinative conclusion is that there

is also substantial evidence to support the ALJ's finding of no disability.").  As previously noted, it

is not this Court's role on appeal from this agency determination to reweigh the evidence or to

substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482,

1486 (10th Cir. 1994).

**B.  RFC Determination**

        Lucero contends the ALJ's finding that he retained the RFC to perform light work is

contrary to the evidence.  Lucero claims the ALJ's RFC determination was "based in part upon

his finding that there is nothing in the treating physician's opinion that 'would preclude the

claimant from performing work at a lower exertional level than his very heavy work as a hod

carrier.'"  Pl.'s Mem. in Supp. of Mot. to Remand at 7.  Lucero than cites to *Allen v. Bowen*, 881

F.2d 37 (3rd Cir. 1989), stating it addressed "this issue" but fails to explain what the issue is.

Other than to cite to a portion of the *Allen* case that does not apply to the case at bar, Lucero fails

to explain his argument yet asserts the Court should reverse and remand for a proper RFC finding.


        The Court has meticulously reviewed the evidence and finds that substantial evidence

supports the ALJ's RFC determination.  After performing a comprehensive evaluation, including

x-rays of the lumbar spine, Dr. Sun completed a Medical Source Statement Of Ability To Do

Work-Related Activities and opined Lucero could lift 45 pounds occasionally and 20 pounds frequently.  Dr. Sun also opined Lucero's impairment did not affect his ability to sit, stand or walk.  Tr. 88-89.  Dr. Dillon also reviewed the record and opined Lucero retained the RFC to perform medium level work.  Dr. Golish also reviewed the record and completed an RFC Assessment form.  Tr. 277-284.  Dr. Golish opined Lucero could lift 50 pounds occasionally, 25 pounds frequently, and stand and/or walk about six hours in an 8-hour workday, and sit about six hours in an 8-hour workday.  Dr. Yoder did an independent review of the record and concurred with Dr. Golish's opinion.  Tr. 284.  Finally, Dr. Toner performed an extensive evaluation and completed a Medical Source Statement Of Ability To Do Work-Related Activities.  Dr. Toner opined Lucero could lift 20 pounds occasionally, 10 pound frequently, sit up to six hours in an 8-hour workday, and stand and/or walk up to six hours in an 8-hour workday.  Tr. 323-324.

Dr. Wellborn's opinion of disability as stated in his February 11, 1997 "To Whom It May Concern" letter, is not in conflict with any of the consulting physicians' RFC assessments.  Dr. Wellborn's letter stated, "He is disabled from his previous position as a hod carrier."  Tr. 100.  The position of a hod carrier is at a higher exertional level than any of the RFC determinations submitted by the consulting physicians.  The RFC assessment is reserved solely to the ALJ. *See* 20 C.F.R. §404.1527(e)(2).  In this case the ALJ found Plaintiff retained the RFC for work that involved lifting 20 pounds occasionally, lifting ten pounds frequently, sitting, standing, and walking for six hours in an 8-hour workday, no frequent bending or twisting, only occasional stooping, and only simple, repetitive work.  Tr. 130.  Substantial evidence supports this finding.

## C.  ALJ's Finding of Depression as "Not Severe" at Step Two

At step two of the sequential evaluation process, the claimant bears the burden to demonstrate that he has a medically severe impairment or combination of impairments that significantly limits his ability to do basic work activities. 20 C.F.R. § 404.1520(c)*; see also, Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Eden v. Barnhart*, No. 04-7019, 2004 WL 2051382 (10th Cir. Sept. 15, 2004). Basic work activities are "abilities and aptitudes necessary to do most jobs," and include the ability to understand, remember, and carry out simple instructions; to use judgment; to respond appropriately to supervisors, co-workers, and usual work situations; and to deal with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(3)-(6).

The step two severity determination "is based on medical factors alone, and . . . does not include consideration of such vocational factors as age, education, and work experience." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cr. 1988); 20 C.F.R. § 404.1520(c). Although step two requires only a "de minimis" showing, the mere presence of a condition or ailment documented in the record is not sufficient to prove that the plaintiff is significantly limited in the ability to do basic work activities, *see Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997). To meet his burden, Lucero must furnish medical and other evidence to support his claim. *Bowen v. Yuckert*, 482 U.S. at 146 & n.5.

The Court has carefully reviewed the record and finds that substantial evidence supports the ALJ's finding that Lucero's depression did not have a significant effect on his ability to work. There is evidence in the record that Lucero has been treated for depression. Lucero also reported he had experienced depression in the past. Tr. 165. The record indicates that on February 15, 2000, Lucero complained of depression and informed Dr. Wellborn that he had previously been on Prozac. Tr. 263. Dr. Wellborn noted "he tells me he is depressed, but is not suicidal." *Id.* Dr.

28

Wellborn prescribed a trial of Paxil.  On March 9, 2000, Lucero requested Dr. Wellborn change

him to Prozac.  Tr. 262.  Dr. Wellborn then prescribed Prozac and told Lucero to return in "a few

months unless the Prozac was ineffective."  *Id.*  Dr. Wellborn did not refer Lucero for counseling

or psychotherapy to treat his depression.  On April 27, 2000, Dr. Walker, an agency consultant

and psychiatrist, reviewed the record and found Lucero's depression was "not severe."  Tr. 268.

Dr. Walker found no functional limitations.  On July 20, 2000, Dr. Wellborn noted Lucero was

responding well to the Prozac.  Dr. Wellborn told Lucero to continue taking the Prozac.  On

November 5, 2001, Dr. Wellborn noted Lucero was on Prozac.  The record does not reflect that

Lucero ever sought counseling for his depression.  Lucero has not shown that his depression

significantly limits his ability to do basic work activities.  Accordingly, the Court finds that the

ALJ's finding that Lucero's depression was not severe is supported by substantial evidence.

**D.  Credibility Determination**

Lucero also contends the ALJ erred in finding that his complaints of pain were not

credible.  Credibility determinations are peculiarly the province of the finder of fact and will not be

upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*,

898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively

linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v.*

*Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination

does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206

F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on

in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of

the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, and the consistency or compatibility of nonmedical testimony with objective medical evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). The inability to work pain-free is not sufficient reason to find a claimant disabled. *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

In making his credibility determination, the ALJ summarized the evidence and concluded:

The September 26, 1996 progress note by Dr. Wellborn indicates that the claimant last saw him in December of 1994 (Exhibit B-2F, p.7). On November 5, 2001, the claimant was to return to see Dr. Wellborn in six months (Exhibit B-14F). Thus, his medical treatment does not reflect an individual who is impaired to the degree alleged. The claimant stated that he found Darvocet to be helpful. He was taking two or at the most three Darvocets per day (Exhibit B-2F, p.5). a lumbar epidural block also decreased the claimant's pain (Exhibit B-2F, p.3). He also testified that heat helps his back.

The claimant testified that he experiences back pain that spreads to the back of his leg, mostly the left, and into his buttocks. He described this pain as a burning pain. He stated that he has this pain every day, sometimes in the morning and sometimes in the p.m. The claimant told Dr. Toner that he has constant low back pain. It is a "5" on a scale of 1 to 10 if he takes his medication and significantly worse if he does not. He told Dr. Toner that he can stand for 10 minutes, sit for 15 minutes, walk for 15 minutes, and ride in an automobile for an hour. He stated that he can lift 15 pounds and is unable to bend down. He further stated that he has to lie down two or three times per day for 20 to 30 minutes each time (Exhibit B-13F, pp. 2 and 4). I conclude that the claimant's statements of symptoms and functional limitations are excessive in light of the record as a whole and, thus, are not fully credible.

I must also consider the claimant's daily activities. I observed at the hearing that the claimant appeared to be very sun tanned. He initially testified that he is outside very little but later testified that he liked to be outside. I also observed that the claimant's hands were very callused. The claimant testified that he did nothing to cause the calluses. It is interesting to note that Dr. Toner also observed during the consultative examination that the claimant's hands were significantly callused and dirty and that there were abrasions on the dorsum of both hands, the right greater than the left (Exhibit B-13F, pp. 2 and 3). The condition of the claimant's hands is inconsistent with his statement to Dr. Toner that he spends his day sleeping, using his heating pad, and watching television (Exhibit B-13F, p.4). This condition

is also inconsistent with his testimony that he does no housework and that he engages in no recreational activities.

Tr. 129.  It is clear from the ALJ's decision that he linked his credibility determination to specific evidence.  Accordingly, the Court finds that the ALJ's credibility determination is supported by substantial evidence and will thus not be disturbed.

**Conclusion**

The ALJ's decision is supported by substantial evidence and he applied correct legal standards.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.


**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

31